SAM & ALI, INC.; Aleb, Inc.; Mallough, Inc.; and Murib, Inc., Plaintiffs–Appellants,

v.

OHIO DEPARTMENT OF LIQUOR CONTROL and William A. Vasil, Defendants–Appellees.

No. 97–3546.

United States Court of Appeals, Sixth Circuit.

Argued Aug. 6, 1998.

Decided Oct. 15, 1998.

Gary W. Lyons (argued and briefed), De-Libera, Lyons & Bibbo, Columbus, OH for Plaintiffs–Appellants.

Chester T. Lyman, Jr. (argued and briefed), James M. Guthrie, Office of the Attorney General of Ohio, Columbus, OH, for Defendants–Appellees.

Before: KRUPANSKY, NORRIS, and SILER, Circuit Judges.

SILER, J., delivered the opinion of the court, in which NORRIS, J., joined. KRUPANSKY, J. (pp. 400–07), delivered a separate opinion concurring only in the result.

SILER, Circuit Judge.

Plaintiffs appeal the dismissal of their complaint raising federal constitutional challenges to an Ohio statute authorizing local option elections to ban sales of alcohol by holders of class C and D liquor permits. For the following reasons, we AFFIRM.

## I.

Plaintiffs brought this action challenging the constitutionality of OHIO REV.CODE § 4305.14, which allows voters to petition for local option elections to determine whether the sale of beer by holders of class C or D liquor permits would be allowed in the precinct. Each of the plaintiffs holds either a class C or D permit. Generally, class C permit holders may sell alcoholic beverages which are not to be consumed upon the premises, OHIO REV.CODE § § 4304.11–.121, and class D permit holders may sell alcoholic beverages for consumption upon the premises. OHIO REV.CODE § 4303.13–.183. Local option elections only affect holders of class C and D permits. Class A–1–A permits, which are not covered by the local option election statute, operate in the same manner as a D–5 permit in that they allow holders to serve beer or liquor by the glass for on-premises consumption. The only difference between the two permits is that an A–1–A permit may only be issued to a microbrewery or winery. *See* OHIO REV.CODE §§ 4303.21, 4303.18.

Pursuant to OHIO REV.CODE § 4305.14, voters presented petitions to the Franklin County Board of Elections seeking an election on the question of whether beer sales by holders of class C or D permits would be allowed in certain precincts within the city of Columbus. A majority of voters in each precinct voted to end the sale of beer by holders of class C or D permits.

The plaintiffs then filed suit against several defendants alleging that the statutory provisions allowing local option elections on this question violated their due process rights under the Fifth Amendment, interfered with their right to contract in violation of the Contracts Clause, and violated their right to equal protection. They also alleged that acts of the defendants to enforce the statute violated their rights under the First, Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments. The remaining defendants on appeal are the Ohio Department of Liquor Control and William Vasil, Director of the Department.

The district court dismissed each of the claims. In issuing its decision, the court relied heavily on the reasoning of *Colson v. City of Shaker Heights*, 880 F.Supp. 1161 (N.D.Ohio 1995), *aff'd*, No. 95–3538, 1996 WL 683595 (6th Cir., Nov.22, 1996), and held that the Ohio legislature may treat various classes of liquor permit holders differently so long as distinctions between the classes are rationally related to a governmental interest. The court concluded that the distinctions implemented by the Ohio legislature were rational and that the local option election statute was therefore constitutionally sound.

## II.

As an initial matter, it is not clear whether the plaintiffs are attacking Ohio's local option election scheme on its face or as applied. Their complaint filed in the district court and brief filed with this court do not directly address this issue, and oral argument did not clarify this question. Their arguments seem to attack the Ohio statutes both on their face and as applied.[1] Plaintiffs' claims would fail under either a facial or as applied analysis but for different reasons. Therefore, we will read their complaint as if they are making both types of attacks and consider each argument.

### A.

■ Any facial attack on the constitutionality of OHIO REV. CODE §§ 4305.14 and 4305.16 is precluded by *37712, Inc. v. Ohio Dep't of Liquor Control*, 113 F.3d 614 (6th Cir.1997), decided after the district court's decision in this case. In *37712, Inc.*, the plaintiffs were a group of businesses who possessed class C and D liquor permits which permitted the retail sale of beer. Some of the plaintiffs operated in precincts where voters had decided, pursuant to local option election, to ban the sale of alcohol under such permits. Other plaintiffs operated in precincts which had not held such elections but sought injunctions invalidating Ohio's local option election statutes. *Id.* at 617–18. The plaintiffs argued that the statutes "facially violate[d] the due process and the equal pro-

---

1. For example, in oral argument, plaintiffs' counsel stated that he was making a facial attack on the local option election scheme "as implemented" in this case.

tection clauses of the Fourteenth Amendment." *Id.* at 618. This court rejected both arguments and upheld the district court's dismissal of the case.

Plaintiffs first argued that the statutes violated their procedural due process rights because "no hearing is afforded prior to the taking of the owner's alleged property interest in the use of its liquor permit in a particular locality." *Id.* at 619. The court rejected that argument, noting that "no notice or opportunity to be heard need proceed [sic] any legislative action of general applicability." *Id.*

Plaintiffs in *37712, Inc.* also made a substantive due process challenge on the grounds that the law allowed voters to target certain establishments for closure while allowing others to continue operations. They focused on the fact that class A–1–A permits were not subject to the local option election, even though they conferred the same rights to dispense alcoholic beverages as D–5 permits. *Id.* at 620–21. The court rejected this specific argument, stating that "the current version of Ohio's local option laws avoid this constitutional defect because all holders of the same type of license to dispense alcoholic beverages in a particular precinct or residence district are exposed to the same potential disabilities consequent to a local option election." *Id.* at 620. As to the distinction in treatment between class A–1–A and class C and D permits, the court concluded "[b]eyond contradiction, the holders of A–1–A licenses are not similarly situated with ordinary retailers of alcoholic beverages, and hence the challenged legislative distinction is not arbitrary and capricious." *Id.* at 621 (citing *Colson,* 880 F.Supp. at 1166).

The court rejected plaintiffs' equal protection argument on the same grounds. Borrowing from the reasoning of *Colson,* the court held that plaintiffs had not met their burden of showing that the classification scheme was arbitrary and did not serve a legitimate governmental purpose. *Id.* at 622. To the contrary, the distinction between class A–1–A and class C and D permits by the Ohio legislature was rational and related to a governmental interest.

Manifestly, a legislative judgment that retail beer sales of the type allowed under an A–1–A permit by a brewery or a brew pub do not pose the same risks of fights, automobile accidents, public disorderly conduct, crime, neighborhood decay, alcohol abuse, and other conceivable ills, as might be presented by ordinary taverns or carry out stores, is not irrational. Additionally, the exemption afforded by A–1–A licenses to breweries and brew pubs from exposure to termination, by local option election, or retail beer sales, is supported by a legislative public policy decision to encourage and protect private investment in costly brewery and brew pub equipment and facilities, and to promote domestic in-state production of beer.

*Id.* at 621. Therefore, the court concluded, the local option election did not violate plaintiffs' equal protection rights.

Plaintiffs in this case raise the same challenges to the same statute. Moreover, like the plaintiffs in *37712, Inc.,* they focus on the similarities between class A–1–A and class C and D permits. However, that argument was soundly rejected by this court in *37712, Inc.,* and plaintiffs' efforts to distinguish or otherwise to discredit that case are without merit. Therefore, plaintiffs' facial challenges to the constitutionality of Ohio's local option election scheme as it applies to holders of class C and D permits is rejected.

**B.**

■ We decline to consider an applied challenge to the Ohio statutes because we determine that it is not ripe for judicial review.

■ "The ripeness doctrine not only depends on the finding of a case and controversy . . ., but it also requires that the court exercise its discretion to determine if judicial resolution would be desirable under all of the circumstances." *Brown v. Ferro Corp.,* 763 F.2d 798 (6th Cir.1985). The basic ripeness analysis requires this court "to evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct.

1507, 18 L.Ed.2d 681 (1967)(*abrogated on other grounds by Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977)). This court has identified several factors to weigh in deciding whether an issue is ripe for review. First, we must consider the hardship to the parties if review is denied. Second, we must examine whether the harm that plaintiffs allege "will ever come to pass." Finally, "we must consider whether the case is fit for judicial resolution ..., which requires a determination of whether the factual record is sufficiently developed to produce a fair adjudication of the merits of the parties' respective claims." *National Rifle Ass'n of America v. Magaw,* 132 F.3d 272, 284 (6th Cir.1997) (citations omitted).

Applying these factors to this case, we conclude that an as-applied challenge is not ripe for judicial review. Plaintiffs conceded in oral argument that there are no A–1–A permit holders who were affected by the local option election held in their precinct. Therefore, they have suffered no harm relative to other classes of permit holders, and it is not clear that such harm will ever occur. Moreover, the factual record is not sufficiently developed for us to consider a challenge to the statute as applied. At this point, we have no more facts to consider than were presented to the court in *37712, Inc.* Therefore, any analysis of this issue would necessarily mirror the analysis set out by the court in *37712, Inc.* As a result, we exercise our discretion to decline to hear an as-applied challenge to the Ohio local option election scheme in this case.

AFFIRMED.

## CONCURRENCE

KRUPANSKY, Circuit Judge, concurring only in the result.

The plaintiffs-appellants, Sam & Ali, Inc. (d/b/a Sam's Food); Aleb, Inc. (d/b/a Linmoor Carry Out); Mallough, Inc. (d/b/a Oasis); and Murib, Inc. (d/b/a Cleveland–Windsor Market), each of which named corporations are licensed by the state of Ohio to sell beer for off-premises and/or on-premises consumption in Columbus, Ohio, have challenged the district court's dismissal of their FED.R.CIV.P. 60 motion to correct its judgment for the defendants-appellees Ohio Department of Liquor Control ("ODLC") and its director William Vasil, as well as its underlying dismissal with prejudice of the plaintiffs' amended complaint. That complaint had sought a declaration that OHIO REV.CODE § 4305.14 [1] transgressed the plaintiffs' substantive due process and equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution [2] and 42 U.S.C. § 1983; a permanent injunction barring the defendants from enforcing against them the adverse results of certain § 4305.14 local option elections which

---

1. OHIO REV.CODE § 4305.14 permits "local option elections" whereby the voters in a particular precinct or "residence district" may, by referendum, outlaw certain retail beer sales within their borders. (A "residence district" is two or more contiguous election precincts located within the same county and also located within the same municipal corporation or within the unincorporated area of the same township. OHIO REV.CODE § 4301(A)(19)).

   The Code permits the following questions to appear on a local ballot regarding beer sales:
   (B) The following questions regarding the sale of beer by holders of C or D permits may be presented to the qualified electors of an election precinct or residential district:
   (1) "Shall the sale of beer as defined in section 4305.08 of the Revised Code under permits which authorize sale for off-premises consumption only be permitted within this (precinct) (district)?"
   (2) "Shall the sale of beer as defined in section 4305.08 of the Revised Code under permits which authorize sale for on-premises consumption only, and under permits which authorize sale for both on-premises and off-premises consumption, be permitted in this (precinct) (district)?"
   OHIO REV.CODE § 4305.14. The failure of a § 4305.14 referendum conforming to question no. 1 invalidates the use of class C liquor permits within the pertinent region, whereas the rejection of a measure comporting with question no. 2 negates type D liquor permits within that area, in accordance with statutory terms. OHIO REV CODE § 4305.14(E); *see* further discussion of types C and D liquor licenses below.

2. Although the plaintiffs' amended complaint further alleged that the subject statute additionally affronted the First, Fourth, Sixth, and Eighth Amendments to the Constitution, as well as the Contracts Clause (U.S. CONST art. I, § 10), they failed to develop any of those theories before this reviewing court.

halted the retail sale of beer in certain Columbus electoral precincts; and monetary damages including litigation costs and attorney fees.

The Ohio legislature has created ten major classifications (incorporating numerous subcategories) of licenses to sell, manufacture, or transport alcoholic beverages,[3] namely types A through I and type W. OHIO REV.CODE §§ 4303.02–.231. Under the Ohio liquor control laws, "retailers who purchase one of the various class C permits may distribute, subject to the terms, conditions, and restrictions appertaining to the particular license subtype, intoxicants including beer, wine, and/or mixed beverages for off-premises consumption." *37712, Inc. v. Ohio Dept. of Liquor Control,* 113 F.3d 614, 617 (6th Cir.1997) (*citing* OHIO REV.CODE §§ 4303.11–.121). Additionally, "[s]ervice establishments including restaurants, hotels, clubs, and the like which procure one of the sundry class D licenses may retail, subject to the terms, conditions, and restrictions applicable to the particular license subcategory, alcoholic beverages for on-premises consumption or for both on-premises and off-premises consumption." *Id.* (*citing* OHIO REV.CODE

§§ 4303.13–.183). Each plaintiff herein possessed either a class C or D liquor license, or a combination of such licenses, which authorized the retail sale of beer for on-premises and/or off-premises customer consumption.[4]

On August 19, 1993, the Franklin County Board of Elections received valid initiative petitions requesting that referenda under OHIO REV.CODE § 4305.14 appear on the November 2, 1993 local election ballots in Ward 13, Precinct B; Ward 17, Precinct E; and Ward 25, Precinct D (each located within the city of Columbus). The business of each plaintiff herein was situated within one of those three Columbus precincts. In each precinct, a majority of the votes cast on November 2, 1993 favored termination of all retail beer sales for both carry out and on-premises consumption under any class C or D permit. On November 26, 1993, the ODLC duly notified each plaintiff that, as of December 26, 1993, its alcoholic beverage retail distribution license(s) could no longer be used at its customary business location, and that it must deliver its liquor license(s) to ODLC for "safekeeping"[5] or voluntary cancellation.

**3.** The term "alcoholic beverage" is used generically in this concurring opinion to subsume every type of state regulated alcohol-containing nonmedicinal beverage, including beer, wine, distilled spirits, and mixed drinks. "Intoxicating liquor" indicates any beverage, other than beer, which contains .5% or more alcohol by volume. OHIO REV.CODE § 4301.01(A)(1). "Beer" includes ale, stout, malt liquor, and all other brewed or fermented malt beverages containing at least .5% alcohol by volume but not more than 6% alcohol by weight. *See* OHIO REV.CODE § 4301.01(B)(2). A "liquor license" generically signifies any state-issued permit to traffic in any alcoholic beverage(s).

**4.** Plaintiff Sam & Ali, Inc., possessed a class C–1 permit which authorized the retail sale of beer in containers for off-premises consumption. OHIO REV.CODE § 4303.11. The fee for a class C–1 permit is $126.00. Plaintiff Aleb, Inc. had purchased a C–2 license for $188.00, which permitted the retail sale of wine and mixed beverages in containers for off-premises consumption, OHIO REV.CODE § 4303.12; plus a $ 126 class C–2x permit, which allowed it as an owner of a class C–2 license to vend beer in containers for off-premises consumption, OHIO REV.CODE § 4303.121. Plaintiff Murib, Inc. acquired a type C–1 license and a class C–2 license. Plaintiff Mallough, Inc. held a class D–5 nightclub license which permitted the retail sale of beer or intoxi-

cating liquor by the glass or in containers for consumption on-premises and the retail sale in containers of beer, wine, or mixed beverages for off-premises consumption, the fee for which was $1,875. OHIO REV.CODE § 4303.18. Intervenor plaintiff Ohio Historical Society possessed a $282 class D–2 authorization which allowed the retail sale of wine and mixed beverages by the glass or by the container for on-premises consumption, or by the container for off-premises consumption, OHIO REV.CODE § 4303.14, a $188 type D–2x permit which licensed it as a D–2 licensee to retail beer by the glass or in containers for on-premises consumption or by the container for off-premises consumption, OHIO REV CODE § 4303.141, and a $600 class D–3 license which allowed the retail sale of spirituous liquor by the individual drink until 1 a.m. for on-premises consumption, OHIO REV.CODE § 4303.15.

**5.** Under OHIO REV.CODE § 4301.39(E), if a local option election illegalizes use of a liquor permit at the location designated on the license, the holder may, within thirty days of certification of the election result, deposit its license with ODLC for "safekeeping." Section 4303.272, together with provisions cited therein, created procedures whereby the owner of an alcohol permit retained for "safekeeping" by ODLC could arrange for the transfer of that license to an alternate (wet) situs within the state.

The plaintiffs inaugurated their complaint in district court on December 27, 1993, which they amended on December 29, 1993. Their theory rested upon the alleged discriminatory confluence of OHIO REV.CODE § 4305.14 (authorizing local option elections to terminate the local retail sales of beer for off-premises consumption under class C permits and/or to forestall local retail sales of beer for on-premises consumption or both on-premises and off-premises consumption under type D licenses, *see* note 1, *supra* ) and OHIO REV.CODE § 4303.021 (permitting, under a $3,125 class A–1–A license, the retail sale of all types of intoxicating libations for on-premises consumption at a beer or wine manufacturing facility, thus effectively exempting retail beer distribution for on-premises consumption at such locations from the local option exposure which threatens retail beer sales for on-premises consumption under a class D license).[6] The litigants filed a joint Stipulation of Facts on November 7, 1994. Following briefing and a hearing, the trial court on April 29, 1997 dismissed the amended complaint with prejudice. On May 28, 1997, the initial forum summarily denied the plaintiffs' motion for correction of its judgment, and a timely appeal followed.

Generally, the states possess broad authority under the Twenty-first Amendment to the Constitution of the United States (which repealed national prohibition of the sale of alcoholic beverages), as well as inherent police powers, to regulate, restrict, or ban the sale of alcoholic beverages within their borders. *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 514–15, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996). Nevertheless, the plaintiffs have marshalled a constitutional assault against § 4305.14 which incorporated aspects of both a "facial" challenge and an "as applied" attack.[7] Via their *facial* offensive, the plaintiffs have charged that § 4305.14 cannot be constitutionally applied to any Ohio beer retailer, including themselves, because § 4303.021's insulation, from local option preemption, of retail beer, wine, or distilled spirit sales for on-premises consumption under a type A–1–A license, while § 4305.14 simultaneously exposes to local option termination all retail beer sales for off-premises and/or on-premises consumption authorized by type C or D permits, is purportedly inherently arbitrary and capricious, and/or irrational.

Substantive due process proscriptions dictate that a state or local legislative measure

**6.** This proviso dictates, in part:

> Permit A–1–A may be issued to the holder of an A–1 [brewery] or A–2 [winery] permit to sell beer and any intoxicating liquor at retail, only by the individual drink in glass or from a container, provided such A–1–A permit premises are situated on the same parcel or tract of land as the related A–1 or A–2 manufacturing permit premises or are separated therefrom only by public streets or highways or by other lands owned by the holder of the A–1 or A–2 permit and used by the holder in connection with or in promotion of the holder's A–1 or A–2 permit business.

OHIO REV CODE § 4303.021.

**7.** This circuit has recently reiterated the distinction between "facial" and "applied" challenges to legislative enactments:

> A court may hold a statute unconstitutional either because it is invalid "on its face" or because it is unconstitutional "as applied" to a particular set of circumstances. Each holding carries an important difference in terms of outcome: If a statute is unconstitutional as applied, the State may continue to enforce the statute in different circumstances where it is not unconstitutional, but if a statute is unconstitutional on its face, the State may not en-

force the statute under any circumstances. Traditionally, a plaintiff's burden in an as-applied challenge is different from that in a facial challenge. In an as-applied challenge, "the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." [Citation]. Therefore, the constitutional inquiry in an as-applied challenge is limited to the plaintiff's particular situation. In comparison, the Court explained in *Salerno* that

> > [a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that *no set of circumstances exists under which the Act would be valid. The fact that [an Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid* [.]

> *Women's Medical Professional Corp. v. Voinovich,* 130 F.3d 187, 193 (6th Cir.1997) (emphasis added) (*quoting United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)), *cert. denied,* — U.S. —, 118 S.Ct. 1347, 140 L.Ed.2d 496 (1998). *See also id.* at 194 (resolving that, in all circumstances except the constitutional review of abortions regulations, "a facial challenge to a statute should fail if the statute has a constitutional application.")

is judicially voidable on its face if it necessarily compels results in all cases which are "arbitrary and capricious, bearing no relation to the police power." *Eastlake v. Forest City Enterprises, Inc.,* 426 U.S. 668, 676, 96 S.Ct. 2358, 49 L.Ed.2d 132 (1976); *see also Gutzwiller v. Fenik,* 860 F.2d 1317, 1328 (6th Cir.1988). However, if *any conceivable legitimate governmental interest* supports the contested ordinance, that measure is not "arbitrary and capricious" and hence cannot offend substantive due process norms. *Curto v. Harper Woods,* 954 F.2d 1237, 1243 (6th Cir.1992).

Similarly, pursuant to equal protection strictures, where ordinary social or economic legislation is in controversy (such as the Ohio liquor control statutes at issue), and no suspect or quasi-suspect class is peculiarly burdened and no fundamental right of any person is uniquely threatened by that legislation (as herein),[8] the states are afforded "wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citations omitted). The courts assess such enactments under the highly deferential "rational relationship" inquiry, the least rigorous of the three traditional equal protection tests, whereby "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* (citations omitted); *see Romer v. Evans,* 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). This presumption prevails even though, in practice, the regulatory classification at issue may trigger some inequities. *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 533 (6th Cir.1998) *(citing Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992);[9] *McGowan v. Maryland,* 366 U.S. 420, 425–26, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961)). As in the analogous substantive due process analysis articulated above, an enactment subject to "rational relationship" equal protection review must be sustained if *any conceivable basis* rationally supports it. *Federal Communications Commission v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Thus, "[t]he burden upon a party seeking to overturn a legislative enactment for irrationally discriminating between groups under the equal protection clause is an extremely heavy one." *Borman's, Inc. v. Michigan Prop. & Cas. Guar. Ass'n,* 925 F.2d 160, 162 (6th Cir.), *cert. denied,* 502 U.S. 823, 112 S.Ct. 85, 116 L.Ed.2d 58 (1991).

The plaintiffs' contention that § 4305.14 and § 4303.021, when assessed in tandem, *facially* offended their substantive due process or equal protection rights because class A–1–A licensees purportedly attained superior legal benefits which the legislators denied to type C and D licensees without rational justification, was precluded by binding direct Sixth Circuit precedent. Following the lower court's initial April 29, 1997 dismissal of the plaintiffs' amended complaint, but prior to the trial court's May 28, 1997 denial of the plaintiffs' Rule 60 motion to correct its judg-

---

8. The Supreme Court has fashioned a tripartite equal protection inquiry. Where a statute or ordinance uniquely impacts adversely a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) (citations omitted). Where legislation uniquely affects a "quasi-suspect" class (*i.e.* one distinguished by gender or illegitimacy), a somewhat less stringent evaluative norm controls (sometimes called "intermediate scrutiny") whereby a legislative classification is deemed legitimate if it is "substantially related to a sufficiently important governmental interest" (gender classifica-

tions) or is "substantially related to a legitimate state interest" (illegitimacy classifications). *Id.* at 440–41, 105 S.Ct. 3249 (citations omitted). These two standards are not implicated in the subject appeal. Rather, as developed *infra,* this action is governed by the least demanding of the three equal protection tests, namely the "rational relationship" standard.

9. In *Nordlinger,* the Supreme Court commented that "[t]he Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are *in all relevant respects alike." Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992) (emphasis added; citation omitted).

ment, this circuit on May 16, 1997 overruled a broad facial due process and equal protection offensive against the Ohio local option statutes in *37712, Inc. v. Ohio Dept. of Liquor Control*, 113 F.3d 614 (6th Cir.1997). A local option election had invalidated 37712, Inc.'s use of its class C and D liquor permits for the retail sale of beer for off-premises or on-premises consumption. *Id.* at 617–18. This court ultimately mandated that the Ohio local option election statutes do not facially run afoul of procedural due process (which is not implicated in the cause currently at bench), substantive due process, or equal protection. *Id.* at 619–23.

Initially rejecting the plaintiff's protest that Ohio local option laws facially infringed substantive due process norms because only *beer* outlets which functioned under class C or D permits were closed by the local option election at issue, whereas the businesses of *other alcoholic beverage* outlets within the same voting precinct were permitted to continue sales authorized by class C or D licenses, the *37712, Inc.* court remarked:

> Local voters possess a legitimate interest in regulating the types, modes, and circumstances of alcohol sales in their neighborhood. Legislative distinctions between various types, modes, and circumstances of dispensing alcoholic beverages generally constitute a reasonable means of furthering that public interest. . . . Simply stated, distinct categories of alcoholic beverage vendors, and sales of different categories of alcoholic beverages, may reasonably and legitimately be subject to different regulations without facially offending the due process clause.

*Id.* at 620 (note omitted).

The *37712, Inc.* court then disposed of the plaintiff's alternate argument that the state legislature had facially acted arbitrarily and capriciously by exempting retail beer sales for on-premises consumption by *breweries* which possessed *class A–1–A permits,* while authorizing local electors to deprive *all other beer retailers* which functioned under *class C or D licenses* of their commerce. This court, in discarding that hypothesis, pronounced:

> Contrary to the plaintiff's posture, however, non-arbitrary material distinctions exist between breweries which sell beer as an incident to their manufacturing operations, and retail operations which merely dispense beer for on-premises or off-premises consumption.
>
> Manifestly, a legislative judgment that retail beer sales of the type allowed under an A–1–A permit by a brewery or a brew pub do not pose the same risks of fights, automobile accidents, public disorderly conduct, crime, neighborhood decay, alcohol abuse, and other conceivable ills, as might be presented by ordinary taverns or carry out stores, is not irrational. Additionally, the exemption afforded by A–1–A licenses to breweries and brew pubs from exposure to termination, by local option election, of retail beer sales, is supported by a legislative public policy decision to encourage and protect private investment in costly brewery and brew pub equipment and facilities, and to promote domestic in-state production of beer.[10] Beyond contradiction, the holders of A–1–A licenses are not similarly situated with ordinary retailers of alcoholic beverages, and hence the challenged legislative distinction is not arbitrary and capricious.

*Id.* at 621 (citation omitted).

The *37712, Inc.* court then resolved that, because the challenged legislative classifications rationally advanced legitimate public interests and thus satisfied substantive due process norms, as pronounced above, they also fulfilled equal protection requisites.[11] *Id.* at 621–23.

---

**10.** At least part of the Ohio legislature's apparent purpose for the very limited local option exception favoring A–1–A enterprises is reflected via OHIO REV.CODE § 4303.021, which dictates in part that "no new A–1–A permit shall be issued to the holder of an A–1 [brewery] or A–2 [winery] permit unless the sale of beer and intoxicating liquor under class D permits is permitted in the residence district in which the A–1 or A–2 permit is located." Clearly, state lawmakers intended to protect, in some measure, the massive capital investments in *preexisting* breweries, perhaps to encourage future investment in expensive alcoholic beverage manufacturing technology and/or domestic production of a commodity frequently imported from outside the state.

**11.** It should be noted that, even in the absence of the *37712, Inc.* decision, the two Sixth Circuit

The appellants *sub judice* in essence have conceded that *37712, Inc.* foreclosed their hypothesis that § 4305.14 and § 4303.021, when read together, facially violated substantive due process and equal protection strictures, because that precedent directed that the Ohio legislature's distinction between the beer retailing activities of alcoholic beverage manufacturers authorized by A–1–A licenses and the beer retailing activities of ordinary carry out stores or taverns enabled by class C or D permits was sensible and non-arbitrary. However, the plaintiffs have argued that the *37712, Inc.* court's analysis was infected with legal error and hence should not be followed. They have urged that the rule of *37712, Inc.* should be revisited and revised by this court.

However, even if analytic error inhered in *37712, Inc.* (which it did not, as developed below), that precedent nonetheless constitutes binding *stare decisis*. No legal authority empowers this panel to reconsider, reverse, overrule, or modify the legal pronouncements of a prior published opinion of this circuit. Rather, *37712, Inc.* may be set aside or altered only by a decision of the United States Supreme Court or by the Sixth Circuit sitting *en banc*. *See United States v. Washington*, 127 F.3d 510, 517 & n. 9 (6th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2348, 141 L.Ed. 2718 (1998); *Cross Mountain Coal, Inc. v. Ward*, 93 F.3d 211, 217 (6th Cir.1996); *Salmi v. Secretary of Health and Human Services*, 774 F.2d 685, 689 (6th Cir.1985); Sixth Circuit Internal Operating Procedure § 22.4.1.

In all events, the purported analytical flaws for which the plaintiffs have faulted the *37712, Inc.* decision were misconceived. The plaintiffs have accused the *37712, Inc.* court of improperly taking "judicial notice" of "judicially manufactured facts" to support its ruling that state lawmakers may rationally and non-capriciously treat the holders of class A–1–A permits differently than owners of class C or D licenses. However, *37712, Inc.* involved a *facial* constitutional challenge to the Ohio local option laws, which focused solely upon the sensibility of the legislative categorizations *per se*.

Thus, because no *applied* constitutional assault had been advocated in *37712, Inc.*, no essential material "facts" had been found by the adjudicating court. *See Brookpark Entertainment, Inc. v. Taft*, 951 F.2d 710, 714 (6th Cir.1991) (mandating that no real issues of material fact are presented for resolution upon a facial challenge to a statute or ordinance), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992). Rather, because *any conceivable* rational, material distinction between two types of alcoholic beverage retailers justifies variant legislative regulation of one group as compared to the other, the *37712, Inc.* forum merely identified possible rational motivations which could support a legislative election to immunize, from the local option, retail beer sales for on-premises consumption at production facilities which operate retail outlets under type A–1–A authorizations, while opting to expose dram

precedents primarily relied upon by the instant plaintiffs would not support their thesis. In *Brookpark Entertainment, Inc. v. Taft*, 951 F.2d 710 (6th Cir.1991), *cert. denied*, 506 U.S. 820, 113 S.Ct. 68, 121 L.Ed.2d 35 (1992), this court merely ruled that former sections of the Ohio local option statutes which had empowered the local voters to target a particular business, as opposed to a rationally distinct *classification* of inebriant retailers, facially impinged substantive due process. This adjudication did not menace a legislative classification, such as the one *sub judice*, which separately categorized materially distinct types of alcohol retailers subject to variant legitimate public interest concerns, as developed herein. In *Colson v. Shaker Heights*, 880 F.Supp. 1161 (N.D.Ohio 1995), *aff'd*, 103 F.3d 129 (Table), No. 95–3538, 1996 WL 683595 (6th Cir.

Nov.22, 1996), this forum, via unpublished adoption of a published district court opinion, squarely pronounced that materially differently situated alcohol retailers, such as those which sell for on-premises consumption versus those which sell for off-premises consumption, may non-arbitrarily be subject to dissimilar regulation, because this distinction "is rationally related to legitimate concerns such as crowd control and unruly behavior which may accompany liquor sales for consumption on the premises." *Colson*, 880 F.Supp. at 1167. However, *Colson* did not suggest that the distinction between retailers which sell for on-premises consumption and retailers which sell for off-premises consumption supports the *only* rationally justifiable regulatory discrimination between categories of retailers in alcoholic beverages.

shops which operate under class D licenses [12] to local option restrictions upon their retail beer sales for on-premises consumption, irrespective of the common factor that establishments operating either an A–1–A or a D permit business may have been licensed by Ohio to sell beer for on-premises consumption.

The plaintiffs have alternatively contended that, even if class C licensees and most class D permittees are sufficiently dissimilarly situated to A–1–A licensees to legitimate disparate state regulation, the *37712, Inc.* court had failed to consider that the owners of class D–5 liquor permits (such as plaintiff Mallough, Inc.) are facially identically situated with the grantees of type A–1–A licenses; thus the diverse treatment of these two classes of licensees is inescapably irrational and/or arbitrary and capricious. However, this assertion is patently fallacious. A class D–5 license, available for a $1,875 fee, authorizes the proprietor of a nightclub to retail beer or intoxicating liquor by the glass or in containers for consumption on-premises, *and* to vend beer, wine, and mixed drinks in containers for consumption off-premises. OHIO REV.CODE § 4303.18. By contrast, the A–1–A permit, which costs $3,125, allows the owner of a brewery (including a microbrewery or brew pub) or a winery to sell beer or any intoxicating liquor by the glass or in containers for consumption *only* on the brewery or winery premises. OHIO REV.CODE § 4303.021. Moreover, the same local option laws regulating the retail sale of intoxicating liquor (excluding beer) apply to both class A–1–A licensees and class D–5 licensees. OHIO

REV.CODE § 4301.35.[13] However, because § 4305.14 governs only class C and D liquor permits (*see* note 1, *supra*), class A–1–A retailers are insulated by state law from local option restrictions upon their state-granted privilege to sell beer for on-premises usage.

Accordingly, by operation of the pertinent Ohio local option statutes, a class D–5 licensee confronts certain disabilities not faced by a type A–1–A permittee, but concomitantly enjoys certain advantages vis a vis a class A–1–A licensee. The D–5 permit-holder is favored in that its night club permit license fee is significantly lower that the A–1–A license, yet that permit nonetheless affords him the privilege of vending alcoholic beverages for *both* on-premises and off-premises consumption; by contrast, the costlier A–1–A permit authorizes the retail sale of alcoholic beverages by a beer or wine manufacturer *only* for on-premises consumption. On the other hand, the law benefits the A–1–A licensee in that it authorizes the retail sale of beer for on-premises consumption and is immunized from local option restriction, whereas the D–5 businessperson is exposed to that contingency.

Because the privileges bestowed and disabilities imposed by the two categories of liquor licenses (A–1–A and D–5) are not identical, the conclusion is compelled that the two types of concerns are not facially similarly situated *in all material respects*. Accordingly, the legislature may, as a general proposition, rationally classify operations of the kind conducted under D–5 licenses differently than businesses transacting A–1–A commerce.[14]

---

**12.** Under *Colson*, because class C retailers may sell beer only for *off-premises* usage, the Ohio legislature clearly had not facially deprived class C license holders of equal protection or substantive due process by safeguarding, against local option termination, the right of A–1–A license holders to sell beer only for *on-premises* consumption. *See Colson*, 880 F.Supp. at 1167.

**13.** The Ohio Revised Code specifies the local option questions respecting sales of wine and/or straight or mixed spirits which may be placed on a local ballot via initiative:

(A) "Shall the sale of wine and mixed beverages by the package, under permits which authorize sale for off-premise consumption only, be permitted in . . . . ?"

(B) "Shall the sale of wine and mixed beverages, under permits which authorize sale for on-premise consumption only, and under permits which authorize sale for both on-premise and off-premise consumption, be permitted in . . . . ?"

(C) "Shall the sale of spirituous liquors by the glass be permitted in . . . . ?"

(D) "Shall state liquor stores for the sale of spirituous liquor by the package, for consumption off the premises where sold, be permitted in . . . . ?"

OHIO REV.CODE § 4301.35.

**14.** While the Ohio legislature apparently designed the A–1–A exemption primarily to benefit breweries, its inclusion of wineries within the class of industries eligible to acquire A–1–A li-

By contrast, in a proper case, a D-licensed retailer of beer for on-premises consumption might successfully promote an *applied* challenge (*see* note 7, *supra*) against an adverse § 4305.14 local option referendum if it can prove that, on the record evidence, its enterprise was precisely similarly situated in all material respects to an extant A–1–A operation (such as a microbrewery or brew pub) within the affected locality. However, the instant plaintiffs have no standing to join such an applied challenge because they have conceded that no A–1–A licensed business operated within any of the Columbus precincts which were subject to the local option elections in controversy, and hence this issue must await resolution on another day. Because no A–1–A licensee operated within the implicated precincts, no possibility existed that any A–1–A licensee could have been precisely similarly situated to any plaintiff, and thus the subject local option referenda could not have unfairly accorded inequitably favorable treatment to any A–1–A enterprise by virtue of the Ohio statutes in controversy.

"Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court." *Murphy v. Hunt,* 455 U.S. 478, 481 n. 5, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam) (*quoting Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). The plaintiffs lack standing to assert an applied challenge to the subject Ohio liquor control laws because they have failed to "demonstrate actual present harm or a significant possibility of future harm," *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 527 (6th Cir.1998), and thus have not proved that they have suffered an "injury-in-fact," *id.* (*citing, inter alia, Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). Consequently, the

plaintiffs have advanced no actual "case or controversy." *See* U.S. CONST. art. III, § 2.

Accordingly, for the reasons stated herein, I concur with the majority's resolution that the district court's judgment should be affirmed.

censes was not irrational, given that A–1–A licenses by their terms authorize the retail sale of all types of alcoholic beverages, including wine. OHIO REV.CODE § 4303.021. The legislature could reasonably presume that the A–1–A fortification

against local option bans on retail beer sales for on-premises consumption would not likely inspire significant traffic at the typical winery in beer for on-premises consumption.